◼ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v RALPH MUSAC-CHIO, Appellant. — Appeal by defendant from a judgment of the Supreme Court, Kings County (Cooper, J.), rendered December 4, 1979, convicting him of manslaughter in the first degree, upon a jury verdict, and imposing sentence. Judgment affirmed. The defendant was indicted for second degree

murder for the death of his wife, by strangulation, in December, 1978. Defendant testified that on the night of his wife's death he had returned home, watched a television program with his wife and seven-year-old daughter and had then sent the child to bed. He then told his wife he had to go out again for a job interview at a restaurant in Manhattan. He had been unemployed for some time. His wife questioned his going out and the two had words. He left and returned some hours later to a dark apartment. He told a police officer, and he testified, that he went directly to the bathroom and then to the master bedroom, where he noticed his wife was not in bed. He went to the dark living room and stumbled over what proved to be his wife's feet. The seven-year-old child awoke, and he kept her from the living room and sent her back to bed. He said he called the police who put him on hold, so he hung up and called his mother and gave her the number of a car service so she could come over. When his mother arrived, the two called the police two (or three) more times before they arrived. He informed the police that $600 and some of his wife's jewelry were missing. He also later said he recalled shaking or pushing his wife by the shoulders and recalled her lying at his feet. He said at trial that this happened as he tried to revive her after he found her body. He said he did not push her during the argument earlier in the evening. A police officer testified that the defendant had told another officer the same thing but also said that he recalled her falling at his feet. He also told the officer he had some lapses of memory. The jewelry was found a few days after the victim's death, in an apparently undisturbed jewelry box in the couple's bedroom. Defendant's friend and former paramour (with whom he had lived a few months before the incident when he and his wife were separated), testified that defendant had called her, told her his wife had been shot and asked what to do. She asked whether he had called the police and told him to call his mother so she could come for the children. She testified to having called him back to find out whether he had called his mother and to having called the mother herself. The mother testified to receiving more than one call from the defendant and to having heard from the friend before she called a car service to come to the defendant's apartment. The defendant had also testified that there were three keys to the apartment. Other witnesses confirmed the number; the first was defendant's (which he first said he had used to enter the apartment upon his return from Manhattan and then said he might not have used because the door was stuck), the second was the wife's (which was found in the living room) and the third was in the possession of the landlord. The police testified that the lock on the apartment door required a key to open from the outside and could be closed by a bolt inside or a key outside. When the police arrived, they found no signs of forced entry at the door or any window (dust at the windows was undisturbed), no signs of a struggle or ransacking, and no signs of drawers left open. The medical examiner concluded that death was due to asphyxiation caused by manual strangulation. The doctor found a number of bruises and scratches on the victim. Without objection from the defendant, his daughter, aged eight at the time of the trial, was permitted to testify as an unsworn witness, following questioning by the court. The child said that she knew that little girls who did not tell the truth would be punished. She had been living with relatives in her father's family since her mother's death. She testified that she and her parents had watched a special Christmas program on television, after which she was sent to bed. She heard her parents fighting and heard her mother screaming and moaning. She then went to sleep and later woke up to go to the bathroom; she passed her parents' bedroom, but did not see her mother there. She was scared and returned to her own bed. Later she awoke and her father talked to her for a long time in her room and told her to tell the truth and maybe he'd

come out all right. At trial she said the noise from the fighting came from the living room; the Grand Jury minutes showed she had there said the noise was from her parents' room. Defense counsel did not request the court to instruct the jury about evaluating unsworn testimony of a child or that the jury be instructed that uncorroborated, unsworn testimony is insufficient to convict. (See CPL 60.20.) The jury did not convict defendant of second degree murder but of first degree manslaughter, charged as a lesser included offense. The questions arising from the unsworn testimony of the defendant's daughter have not been preserved for appellate review as a matter of law. (See CPL 470.05, subd 2; cf. *People v Thomas,* 50 NY2d 467, 471.) Nonetheless, we have reviewed the record. The trial court did not abuse its discretion in permitting the child to testify. The overwhelming bulk of her testimony was in fact corroborated. None of the defendant's contentions warrant reversal of his conviction. Mollen, P. J., Damiani, Gibbons and Thompson, JJ., concur.